# EXHIBIT A

1

1         IN THE UNITED STATES DISTRICT COURT

2          FOR THE SOUTHERN DISTRICT OF TEXAS

3               HOUSTON DIVISION

4

5  DIGITAL DRILLING DATA    :

6  SYSTEMS LLC           :       Civil Action No.

7  vs.                 :        4:15-cv-2172

8  PETROLINK SERVICES INC.  :

9  & LEE GEISER          :

10

11

12  VIDEOTAPED DEPOSITION OF NILS ANDERS BENSON, 30(b)(6)

13              AND INDIVIDUALLY

14  THIS TRANSCRIPT CONTAINS ATTORNEYS' EYES ONLY TESTIMONY

15

16     Called as a witness by the Defendants, taken before

17  Peggy Ann Antone, a Certified Shorthand Reporter in and

18  for the State of Texas, on February 21, 2017, beginning

19  at 9:05 a.m., at the offices of Blank Rome, LLP, 717

20  Texas Avenue, Suite 1400, Houston, Texas, pursuant to

21  the Federal Rules of Civil Procedure and the following

22  stipulation and agreement of counsel:

23

24

25

2

1          A P P E A R A N C E S

2   COUNSEL FOR DIGITAL DRILLING DATA SYSTEMS LLC:

3        Blank Rome LLP

4             **STEPHEN D. ZINDA**

5             **LOUIS BRUCCULERI**

6             717 Texas Avenue

7             Suite 1400

8             Houston, Texas  77002

9             Phone:  713.632.8657

10            Fax:  713.583.2179

11            SZinda@BlankRome.com

12            LBrucculeri@BlankRome.com

13

14  COUNSEL FOR PETROLINK SERVICES INC. & LEE GEISER:

15       Vinson & Elkins

16            PETER E. MIMS

17            1001 Fannin Street

18            Suite 2500

19            Houston, Texas  77002

20            Phone:  713.758.2732

21            Fax:  713.615.5703

22            pmims@velaw.com

23            Shill@velaw.com

24

25

3

1   ALSO PRESENT:

2        Lee Geiser

3        Phoeun Pha

4        Steve Green, Videographer, DepoTexas

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

9

1               P R O C E E D I N G S

2               THE VIDEOGRAPHER:  Do you want to waive the

3   Federal rule requiring read-in?

4               MR. BRUCCULERI:  I usually don't do that.

5   I'm happy to do it.

6               MR. MIMS:  I don't need it.

7               MR. ZINDA:  Waive it.

8               MR. MIMS:  Which is under the rules, I

9   assume.  Right?

10              You want to do review and signature;

11   correct?

12              MR. ZINDA:  Yeah.

13              THE VIDEOGRAPHER:  Date is February 21st,

14   2017.  Time is approximately 9:06 a.m.  We're on the

15   record.

16                    NILS ANDERS BENSON,

17   having been first duly sworn, testified as follows:

18                    EXAMINATION

19   QUESTIONS BY MR. MIMS:

20       Q.   Please state your name.

21       A.   My name is Nils Anders Benson.

22       Q.   And where do you reside?

23       A.   I reside in Dallas, Texas.

24       Q.   What's your street address?

25       A.   8307 San Cristobal Drive, Dallas, Texas 75218.

1      A.    Yeah, this comes out of our source control.

2      Q.    Right.  And your lawyers produced it to us?

3      A.    Correct.

4      Q.    If you look at the very top, "Change 19473."

5      A.    Uh-huh.

6      Q.    On 6-30 by you; correct?

7      A.    Uh-huh.

8      Q.    "Merging changes to support locking petrolink

9  out of our database."

10     A.    Uh-huh.

11     Q.    So isn't it true that actually you had already

12 started to lock them out before you got called to the

13 Crescent rig on 7 -- July 2nd, 2015.

14     A.    Well, while I referred to Petrolink in this

15 check-in comment, it more generally locked out anything

16 that was unauthorized.

17     Q.    Right.  But it had the effect of locking out

18 not only Petrolink, but other programs.

19     A.    Correct.

20           (Exhibit 38 was marked.)

21     Q.    (BY MR. MIMS)  Mr. Benson, the court reporter

22 has handed you Exhibit 38.

23           Do you see -- you recognize this page?

24     A.    Yes.  It's from our support site.

25     Q.    Right.  And if you look at data storage,

53

1    there's a quote here that says, "All data generated by

2    the DigiDrill system is stored in an open database file

3    to give the user the ability to query the data using

4    off-the-shelf software products."

5                    Now I wanted to ask you about this -- that

6    sentence.

7         A.   Uh-huh.

8         Q.   What off-the-shelf software products could be

9    used?

10        A.   Well, it would really depend.

11        Q.   Can you name the ones you were referring to in

12   this message to your customers?

13        A.   I wasn't referring to any specifically.  This

14   was a marketing line that we put together and it did

15   refer specifically to a much older version of the

16   software.

17        Q.   Right.  So you also said it was stored in an

18   open database file.

19                    That would be the Firebird database,

20   wouldn't it?

21        A.   No, it was Microsoft Access.

22        Q.   Well, this was still on your web page in 2014;

23   correct?

24        A.   That was an oversight.

25        Q.   But it was on your web page.

54

1    A.   Yes.

2    Q.   Correct?   Who was in charge of the web page?

3    A.   No one in particular.

4    Q.   Well, there had to be somebody who put these

5    pages up.   Who put this page up that we're referring to

6    as Exhibit 38?

7    A.   I don't know.

8    Q.   Someone in marketing?

9    A.   Possibly.

10   Q.   Would it be someone -- so you don't know who

11   did it?

12   A.   This particular page, no, I don't.

13            (Exhibit 39 was marked.)

14   Q.   (BY MR. MIMS)  I've handed you Exhibit 39.  And

15   do you recognize this as --

16   A.   This is from --

17   Q.   -- an updated file from your web page?

18   A.   This is from the main website.

19   Q.   Today.

20   A.   No, it does not say this today.

21   Q.   It doesn't have the change in the database

22   storage paragraph that we just --

23   A.   Or, rather, yes, it does, it no longer says,

24   "...an open database file..."

25   Q.   Right.  So you changed that.

55

1      A.   Yes, we did.

2           (Exhibit 40 was marked.)

3      Q.   (BY MR. MIMS)   The court reporter has handed

4  you Exhibit 40.

5      A.   Uh-huh.

6      Q.   And can you identify this as also coming from

7  your website?

8      A.   Yes.   This is an older version of the main

9  website.

10     Q.   And this is -- the one I just handed you, 39,

11 is the updated current version?

12     A.   That's correct.

13     Q.   Do you know when that change was made?

14     A.   Yes.   That change was made when -- around the

15 time period that we filed the suit.

16     Q.   So prior to the lawsuit, Exhibit 40 was on your

17 web page.

18     A.   Yes.

19     Q.   And this one says, on the -- this is -- what

20 did you call this?   The --

21     A.   Support site?

22     Q.   Yeah.   It's the main -- main website, you said,

23 on 40.

24     A.   40 is the main website, yes.

25     Q.   Okay.   When you say the main website, what is

56

1    the other kind of website?

2         A.    We have three.

3         Q.    Can you identify those for me?

4         A.    We have the main website, which is

5    www.digidrill.com.

6         Q.    Okay.

7         A.    We have the support website, which is

8    support.digidrill.com, and that also includes our

9    ticketing system.   And then we have our realtime site,

10   which is LiveLog.digidrill.com.

11        Q.    And the realtime site is for people to access

12   data.

13        A.    Correct.

14        Q.    So your main website had this, up until the

15   time of the lawsuit, had this same sentence that says,

16   "All data generated by the DigiDrill system stored in an

17   open database file to give the user the ability to query

18   the data using off-the-shelf software products."   Right?

19        A.    Yes.

20        Q.    Did anyone ever ask you about off-the-shelf

21   software products?

22        A.    No.

23        Q.    Are you -- were you involved in the marketing

24   of this software?

25        A.    Not particularly.

57

1  Q.   Who -- who primarily marketed this software to

2  the MWD companies we care about in this lawsuit?

3  A.   We didn't really have to do much marketing to

4  sell the product.

5  Q.   But who did it?

6  A.   It depends on the time period.

7  Q.   Let's say 2012 to 2015.

8  A.   It would have primarily been Adam Erwin.

9  Q.   Does Adam Erwin still work for DigiDrill?

10  A.   Yes.

11  Q.   What's his current position?

12  A.   He is a sales manager.

13         (Exhibit 41 was marked.)

14  Q.   (BY MR. MIMS)  Can you identify Exhibit 41?

15  A.   Yeah, this looks like it's a tri-fold sales

16  brochure.

17  Q.   Who would have prepared this sales brochure?

18  A.   I don't know who prepared this one exactly.

19  Maybe it was Adam, maybe it was Cory.  I'm not sure.

20  Q.   Who was the second name, Cory?

21  A.   Cory Sangster.

22  Q.   Is he still with you?

23  A.   Yes.

24  Q.   And he's in sales?

25  A.   He's COO.

58

1    Q.   Oh, he's the chief operating officer?

2    A.   Yes.

3    Q.   What are Cory's duties?

4    A.   He primarily oversaw day-to-day operations in

5    Houston.

6    Q.   How many locations do you have?

7    A.   We had two.

8    Q.   You used the past tense.   How many do you have

9    today?

10   A.   Technically we have two.   If you count my

11   house.

12   Q.   And your house is in Dallas?

13   A.   Yes.

14   Q.   How many offices do you have outside of your

15   home?

16   A.   One.

17   Q.   Okay.   And that's in Dallas?

18   A.   That's in Houston.

19   Q.   That's in Houston.   And Cory is full-time COO?

20   A.   Yes.

21   Q.   All right.   So if you look at Exhibit 41, under

22   DataLogger.

23   A.   Yes.

24   Q.   The third item in the listing is, "Open

25   database storage format."

59

1    A.    Yes.

2    Q.    So were you aware that this was on this

3    brochure?

4    A.    No.

5    Q.    Did anyone ask you to review these brochures?

6    A.    Before we printed them?

7    Q.    Yes, sir.

8    A.    Not typically, no.

9    Q.    What time frame -- strike that.

10            Was there a prior version of this or was

11   this sort of the only marketing material that listed all

12   the products?

13   A.    You know, I'm sure that there were older

14   versions of this, but I'm also pretty certain that most

15   of this text was carried over from version to version of

16   these brochures.

17            MR. MIMS:  We're going to have to stop

18   because we have a disc change, so let's go off the

19   record.

20            THE VIDEOGRAPHER:  10:07.  Off record.

21            (Recess taken from 10:07 a.m. to

22             10:22 a.m.)

23            THE VIDEOGRAPHER:  10:22.  Back on the

24   record.  Disc 2.

25   Q.    (BY MR. MIMS)  Mr. Benson, you understand we're

63

1    Q.   Of what?

2    A.   That this application had been developed.

3    Q.   Anything else you knew about Mr. Geiser when

4    you filed the lawsuit, besides his direct knowledge?

5    A.   Oh, I didn't know very much about him.

6    Q.   Did you do any investigation of Mr. Geiser

7    before this lawsuit was filed?

8              MR. ZINDA:  Objection.  I just want to

9    make -- direct the witness don't disclose the substance

10   of any communication with counsel or any investigation

11   counsel have done on behalf of DigiDrill.

12   A.   I have not done any investigation of him.

13   Q.   (BY MR. MIMS)  Did you know any facts that

14   suggested he was involved in the actual programming of

15   the Petrolink program?

16             MR. ZINDA:  Objection.  Form as to time.

17   Q.   (BY MR. MIMS)  At the time you filed the

18   lawsuit, when you -- when you verified this petition and

19   brought a legal action against him.

20   A.   That he had directly developed it?

21   Q.   Yes.

22   A.   Oh, I had no idea.

23   Q.   Had anybody ever mentioned to you in your

24   discussions with Phoeun or others at Petrolink that

25   Mr. Geiser was involved in developing the application.

64

1    A.   In developing the application, no.

2    Q.   So why did you add him?

3    A.   Because he was the president at the time.

4    Q.   Did you have any other facts about his position

5    as president besides the fact that he was the president?

6    A.   In what sense?

7    Q.   Did you understand anything about his financial

8    interest in the company?

9    A.   No, I didn't know anything.

10   Q.   Did you try to find out?

11   A.   I didn't try to find out.

12   Q.   So all you had as a basis was that he was the

13   president of this company and you assumed he had

14   knowledge of these facts?

15              MR. ZINDA:   Objection.   Misstates prior

16   testimony.

17   Q.   (BY MR. MIMS)  All right.  Let me start over

18   again.

19              You knew he was the president.

20   A.   Yes.

21   Q.   Any other fact directly about this program that

22   you knew when you filed this lawsuit?

23   A.   I knew that Phoeun said that they would not pay

24   for WITSML data from us and that it had come from Lee.

25   Q.   All right.  So he wouldn't pay for the fee.

66

1    orchestrated and directed the preparation of Petrolink's

2    Unlawful Data Scraper Program."

3                    Do you see that?

4        A.   Yes, I do.

5        Q.   Tell me how -- what information and belief you

6    had about his conception of this program.

7        A.   I don't know that he conceived of the program.

8    But it was done under his direction.

9        Q.   I said "conceived."   What evidence did you have

10   at the time you filed this lawsuit of conception by

11   Mr. Geiser?

12       A.   I didn't have any.

13       Q.   You had no evidence?

14       A.   I did not at the time, no.

15       Q.   You said on information and belief in your

16   verification that he did, however; correct?

17       A.   I did believe, yes.

18       Q.   But you didn't -- you had no evidence?

19       A.   No direct evidence.

20       Q.   Do you have any circumstantial evidence that he

21   conceived the program?

22       A.   Based on my discussion with Phoeun, and it

23   seemed to me at the time that nothing happened without

24   his say-so.

25       Q.   So your -- the basis of your filing a lawsuit

1      A.   Well, if they need support, they can call in

2  and they can be charged a fee per incident.

3                 (Exhibit 46 was marked.)

4      Q.   (BY MR. MIMS)  I've handed you what's marked

5  46.

6                 And can you identify this document?

7      A.   Yeah, it's also from the support site, and the

8  FAQs, you know, the prerequisites for installing the

9  DataLogger.

10     Q.   Is this accurate?

11     A.   Not entirely.

12     Q.   What's -- what's inaccurate about it?

13     A.   Well, it specifically calls out that Firebird

14  needs to be installed on its own, but that's not true,

15  because it's included with all of our application

16  installers and is installed automatically as part of

17  that process.

18                 It is true that you need to install the

19  driver setup for either your 32- or 64-bit system prior

20  to installing the rest of the software.

21     Q.   Well, it does -- this document in 2013 said you

22  installed Firebird prior.

23                 Why was it -- who would have written this?

24     A.   In 2013, it could have been any number of

25  people.  I really don't know who wrote this

106

1    specifically.

2         Q.   Well, in 2013, could you have installed

3    Firebird first?

4         A.   It would have been highly unlikely.

5         Q.   All right.  So you don't know why this was in

6    there.

7         A.   It's possible that it was in there just for

8    completeness.  You know, we do provide the Firebird

9    installer, standalone download from our download site.

10   There are situations where the Firebird installation can

11   become corrupted for some reason.  I don't really know

12   what causes it.

13              And sometimes it is necessary to just

14   simply reinstall Firebird.

15        Q.   And when you say "reinstall," that means --

16   what this is talking about is -- here, this sentence

17   we're reading is that "DataLogger requires that the"

18   drive -- "DigiDrill driver pack and Firebird SQL

19   Database Server installed prior to running the setup for

20   DataLogger..."

21              So what -- I didn't follow what you meant

22   by that?

23        A.   It is not true that you have to install

24   Firebird on its own prior to installing our software.

25        Q.   When you say that sometimes it's necessary to

1 just simply reinstall Firebird, is that when you've

2 installed everything, it's still not working right, so

3 you just reinstall it?  Is that what you're saying?

4     A.   Yeah.   You could uninstall our entire

5 installation package, make sure everything was removed,

6 and reinstall it; or in some cases, it's faster to

7 simply reinstall Firebird on its own.   But it is not

8 necessary to install Firebird on its own on a clean

9 machine with no Firebird installation on it already.   We

10 include that.

11     Q.   So down below, there's downloads for the

12 drivers and Firebird, the open source software and

13 database server.

14     A.   Yes.

15     Q.   So those are separate downloads.   So they're

16 not -- they're --

17     A.   We --

18     Q.   Right?   You can download each of these

19 individually?

20     A.   You can, yes, but it is not necessary to

21 download Firebird on its own.

22     Q.   Well, you would click this, right, to download

23 it?

24     A.   This is not where you would get our downloads

25 normally.   This is not our download page for our

145

1  server is a facilitator for communication with a

2  particular database.

3      Q.   When you -- when DigiDrill -- strike that.

4           When a licensee downloads the Firebird

5  database prior to this lawsuit, did you require the

6  licensee to change the password for the database?

7      A.   The Firebird database is installed as part of

8  our installer package and the user is not required to

9  change the password.

10     Q.   In fact, none of your instructions in your

11 manual and nothing in your contract mentioned anything

12 about the Firebird database; right?

13     A.   That's correct.

14     Q.   And you knew that Firebird has a default

15 database -- default password.

16     A.   Yes, I did know that.

17              (Exhibit 52 was marked.)

18     Q.   (BY MR. MIMS)   Have you seen this Firebird FAQ

19 before?

20     A.   Yes, I have.

21     Q.   And it indicates that when you set up a

22 Firebird database, it comes with a built-in password,

23 doesn't it?

24     A.   Yes, it does.

25     Q.   And it also comes with a default user ID.

146

1    A.   Yes, it does.

2    Q.   What's that user ID?

3    A.   SYSDBA.

4    Q.   So when your licensees downloaded the

5    DataLogger and the Firebird and the drivers, when they

6    turned -- when they started using that database, the

7    user ID was still SYSDBA and the password was masterkey.

8    A.   Yes, it was.

9    Q.   When was the first time you ever discussed

10   passwords with a MWD licensee?

11   A.   We never have.

12   Q.   You never have.

13   A.   No.

14   Q.   But you are aware of the -- the user ID and the

15   password that were defaults?

16   A.   Yes, I am aware of that.

17   Q.   And you were aware of it when you were

18   programming DataLogger?

19   A.   Yes, we were aware of it.

20   Q.   Earlier, we talked about some of the documents

21   on your website.

22   A.   Uh-huh.  Yes.

23   Q.   We talked about an open database to give the

24   user the ability to query the data using off-the-shelf

25   products.

147

1              Didn't you know that an off-the-shelf

2 product could be used to query the database using this

3 user ID and password as default?

4      A.   I'm aware that it could be queried with a user

5 name and a password.

6      Q.   Did you ever tell an MWD company not to access

7 the Firebird database?

8      A.   No.   We also never told them that they could or

9 what the user name and password were.

10             MR. MIMS:   Object to the last part of the

11 answer as nonresponsive.

12      Q.   (BY MR. MIMS)  Did you ever consider requiring

13 the MWD companies to adopt a second user ID and a second

14 password other than the default user ID and password?

15      A.   We considered a variety of options.

16      Q.   Did you ever consider that option?

17      A.   Possibly.

18      Q.   You don't recall?

19      A.   I don't recall.

20      Q.   What other options did you consider?

21      A.   We considered the possibility of changing the

22 user name and/or password as part of our installer.

23      Q.   Did you ever do that?

24      A.   No, we did not.

25      Q.   When you were discussing, in 2014, with Mr. Pha

Nils Anders Benson                                                                324

```
 1    DIGITAL DRILLING DATA SYSTEMS LLC vs. PETROLINK SERVICES

 2                      INC. & LEE GEISER

 3                    NILS ANDERS BENSON

 4

 5                   CHANGES AND SIGNATURE

 6    PAGE LINE CHANGE              REASON

 7    24    6      "ALS" to "LAS"             mistranscription

 8    109   3      "PCP/IP" to "TCP/IP"       mistranscription

      144   25     "collect" to "connect"     mistranscription
 9
      166   2      "books" to "box"           mistranscription
10
      197   5      "reported" to "recorded"   mistranscription
11
      198   24     "yet" to "yes"             mistranscription
12

13    _____

14    _____

15    _____

16    _____

17    _____

18    _____

19    _____

20    _____

21    _____

22    _____

23    _____

24    _____

25    _____
```

NILS ANDERS BENSON

Page 2

_____

_____

_____

_____

_____

_____

        I, NILS ANDERS BENSON, have read the foregoing

deposition and hereby affix my signature that same is

true and correct, except as noted above.




        _____

        NILS ANDERS BENSON

326

1  THE STATE OF TEXAS:

2  COUNTY OF HARRIS:

3

4          I, Peggy Ann Antone, Certified Shorthand

5  Reporter in and for the State of Texas, do hereby

6  certify that the facts stated by me in the caption

7  hereto are true; that the foregoing deposition of NILS

8  ANDERS BENSON, the witness hereinbefore named, was taken

9  by me in machine shorthand, the said witness having been

10  by me first duly cautioned and sworn under oath to tell

11  the truth, the whole truth and nothing but the truth,

12  and later transcribed from machine shorthand to

13  typewritten form by me.

14          I further certify that the above and

15  foregoing deposition, as set forth in typewriting, is a

16  full, true and correct transcript of the proceedings had

17  at the time of taking said deposition.

18          I further certify that I am neither

19  attorney or counsel for, nor related to or employed by

20  any of the parties to the action in which this

21  deposition is taken, and further that I am not a

22  relative or employee of any attorney or counsel employed

23  by the parties hereto, or financially interested in the

24  action.

25          I further certify that signature of the

327

1   witness was requested, and, if requested, the

2   corrections/changes are attached.

3           I further certify that charges for the

4   preparation of the foregoing completed deposition were $

5   _____ for the original thereof, charged to

6   Attorney(s) for _____.

7           GIVEN under my hand and seal of office on

8   this, the 23rd day of February, 2017.

9

10

11          ------------------------------------

12          Peggy Ann Antone, RMR, CRR

13          Notary Public, State of Texas

14          Commission expires 8/28/20

15

16          DepoTexas, Inc.

17          Firm Registration No. 95

18          13101 Northwest Freeway, Suite 210

19          Houston, Texas 77040

20          (281) 469-5580

21

22

23

24

25